## Case No. 1,693.

### BOUCICAULT v. WOOD.

[2 Biss. 34;[1] 7 Am. Law Reg. (N. S.) 539.]

Circuit Court, N. D. Illinois. Nov. Term, 1867.

COPYRIGHT—ACTION BEFORE PUBLICATION — FOREIGNER—RESIDENCE — INTENTION — SLIGHT ALTERATIONS — CONSENT — REPRESENTATION NOT PUBLICATION — LITERARY PROPERTY — COMMON-LAW RIGHTS.

1. The right of action at law, as well as in equity, conferred by the copyright law of Feb. 3, 1831 [4 Stat. 438], may accrue before actual publication of the work.

2. The proper filing of the title of a work brings the author within the law, and the 5th section does not deprive him of his action for injury previous to publication.

[Overruled in Centennial Catalogue Co. v. Porter, Case No. 2,546.]

3. The same rule applies to the supplemental act of Aug. 18th, 1856 [11 Stat. 138]; and the author or proprietor of a dramatic work may maintain an action for infringement of his copyright committed after the filing of the title, but before publication.

4. In order to entitle an alien to the benefit of these laws, he must prove himself a resident of the United States. Residence, within the

meaning of the statute, is to be determined by his intention, accompanied by his acts, not simply by lapse of time. The fact that he left the country after filing the title does not necessarily deprive him of his rights; the change of intent does not avoid the copyright; but if previous to the filing he had such intention he is not within the protection of the statute.

5. It is not necessary that the play should be identical, word for word; and the alteration of a portion of the language would not deprive the author of his rights.

6. Consent of the author to publication abroad, places him in the position of a foreign author and is an abandonment of his rights under our statute.

7. By publication is meant publication "in print." Representation upon the stage by or with the consent of the author, is not "publication."

8. Common law rights of authors run only to publication. Thereafter their sole protection is the statute.

[Cited in Boucicault v. Hart, Case No. 1,692; The "Iolanthe" Case, 15 Fed. 442.]

9. For infringement on unpublished plays, there is no limit as to damages.

At law. Action [by Dion Boucicault against Joseph H. Wood] for infringement of copyright in three plays composed by plaintiff, "Pauvrette," "The Octoroon" and "Colleen Bawn." [Verdict for plaintiff.]

The plaintiff was a native of England, and was never naturalized. He resided in New York city for several years, and there composed the plays in question, the titles of which he duly filed. He afterwards published "Pauvrette." The "Octoroon" and "Colleen Bawn" were never published in print by or with the consent of the author. The alleged infringement consisted in the representation of these plays at a museum, under the management of defendant. The plaintiff counted under the statute for damages for wrongful representation of the plays, claiming that all had been duly copyrighted by him while a resident of the United States, and he also claimed damages at common law for unlawful use and representation of "The Octoroon," and "Colleen Bawn," which have never been published by him or with his consent.

[2][He deposited the printed title-page of "Pauvrette" in the clerk's office of the district court of the southern district of New York, in September, 1858, printed the book in October, 1858, and at that time deposited a printed copy of the work, as provided by law, in the same clerk's office. He deposited the title-page of "The Octoroon" with the clerk on December 12th, 1859, and of "The Colleen Bawn" March 23d, 1860, and never printed or published either of these two. Wood, the defendant, in 1864, 1865, and 1866, was proprietor of "Wood's Museum," in Chicago, in which at various times during these years he caused the above three plays to be represented without license from Boucicault. This was an action on the

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

[2] [From 7 Am. Law Reg. (N. S.) 539.]

case to recover damages for the wrongful representation of these plays. The declaration contained seven counts: 1. A count as to "Pauvrette," alleging the steps taken to secure the copyright, and the infringement. 2. As to "The Octoroon," alleging the deposit of the title-page, and that the play had never been published by plaintiff, or with his consent, and the infringement. 3. As to "The Colleen Bawn," substantially the same as the 2d count. 4. A count at common law, alleging that the plaintiff is the author and proprietor of "The Octoroon," a play never published by him nor with his consent, nor ever generally given to the public by him, but still in manuscript, from the representation of which, by his license, he has derived profit. That the defendant, without having been able to do so from any previous representation of it, nor from memory, nor from its production to any audience, but solely from a manuscript copy of it surreptitiously and wrongfully obtained, represented it at various times at his theater. 5. A count at common law similar to the 4th, as to "The Colleen Bawn." 6. A count at common law as to "The Octoroon," similar to the 4th, with the difference that it alleged that the defendant produced it from a printed copy wrongfully and surreptitiously printed by some one unknown to the plaintiff, and without his consent, and surreptitiously obtained by defendant. 7. A count at common law similar to the 6th, as to "The Colleen Bawn."

[The plea was the general issue, as provided by statute, and the defences made under it, without and with notice, were: 1. That at the time he sought to copyright the plays plaintiff was not a resident of the United States, within the meaning of the act of 1831. 2. That no sufficient steps had been taken by him to secure a copyright. 3. That he had not deposited a printed copy of "The Octoroon" and "The Colleen Bawn," in the clerk's office. 4. That, to secure his copyright on "The Octoroon" and "Colleen Bawn," they must have been printed and published. 5. That Mr. Boucicault has for years allowed these plays to be performed all over the country, and has permitted printed copies of "The Octoroon" and "Colleen Bawn" to be sold by publishers and booksellers without restraining or prosecuting them, and has, therefore, abandoned all his rights to them, if any he had, as well under the statutes of the United States as at common law. 6. That the action (on the case) could not be maintained, the only remedy being in equity.] [3]

Clarkson & Van Schaack, for plaintiff.
Geo. C. Bates, for defendant.

DRUMMOND, District Judge, charged the jury as follows: The act of Feb. 3d, 1831 (4 Stat. 438), protected the author of any

[3][From 7 Am. Law Reg. (N. S.) 539.]

book in the right to print and publish such book, provided he was a citizen of the United States, or a resident therein. The fourth section of that act declared how such author should proceed in order to make that protection available to him. It declared that he should not be entitled to the benefit of the act unless, before publication, he deposited a printed copy of the title of the book in the clerk's office of the district court of the district wherein he resided.

The fifth section declared that no person should be entitled to the benefit of the act unless he gave information of the copyright being secured, by causing to be inserted in the copy of each and every edition published, during the term secured, on the title page or the page immediately following it, a notice of the fact of such right being secured to him, and the words by which such notice was to be given were specified in that section.

The sixth section of the act provided for the recovery of certain penalties if any person or persons, after the recording of the title of the book, should publish, import or cause to be printed or imported, any copy of such book without the consent of the person legally entitled to the copyright thereof, first had in writing, and a forfeiture in money could be enforced by an action of debt.

The seventh section made the same provision substantially in relation to certain other works, such as a print, cut or engraving, map, chart, or musical composition.

It is apparent from what has been stated in relation to these various sections of the law of 1831, that there was a right of action before the publication was actually made. The fourth section of the act provided that the author of a book, within three months from the publication, should cause to be delivered a copy of the same to the clerk of the district court; but from what has been already stated, it is clear that a right of action accrued before the deposit of this copy of the book, because the language of the sixth and seventh sections is express, that if any other person or persons, from and after the recording of the title of the book should violate any of the provisions of those sections they were liable to an action for the benefit of the author, so that, under the act of 1831, there can be no doubt that not only a suit in equity, but at law, could be maintained before the publication of the work, for the benefit of any party aggrieved.

Turning then to the act of Aug. 18th, 1856 (11 Stat. 138), and construing it by the light thrown upon the subject by the previous act of 1831, the question is, what rights there are under the more recent statute. The act was declared to be supplemental to the act of 1831, and it set forth that "any copyright hereafter granted under the laws of the United States to the author or pro-

prietor of any dramatic composition, designed or suited for public representation, shall be deemed and taken to confer upon the said author or proprietor, his heirs or assigns, along with the sole right to print or publish the said composition, the sole right also to act, perform, or represent the same, or cause it to be acted, performed, or represented, on any stage or public place, during the whole period for which the copyright is obtained."

It will be observed that this act speaks of a copyright being obtained and granted, but it is clear that it does not necessarily mean that the title of the work shall be deposited with the clerk of the district court, and publication made, because that is not the meaning of the term in the original law, to which this is supplemental, as will be seen from what has been already said. The language of the fifth section of the act of 1831 is, that no person shall be entitled to the benefit of this act, unless he shall give information of the copyright. That section must be construed with the other sections which immediately follow it, the sixth and seventh, and, of course, it is not intended by this language to deprive of his action a party who may be injured between the time of filing his title in the clerk's office and the time of publication.

As I have already said, it in terms gives the right of action in such case. Then this supplemental act does not necessarily mean by the term "copyright being granted," that the book has been published and notice given; otherwise, the author of a book, under the act of 1831, would have a more complete remedy than the author of a play, under the supplemental act of 1856; so that, comparing the two acts together, and construing the latter by the light thrown upon the subject by the various provisions of the prior act, I think we may arrive at a conclusion as to what is the meaning of this clause of the act of 1856, namely: "and any manager, actor, or other person, acting, performing, or representing the said composition, without or against the consent of said author or proprietor, his heirs or assigns, shall be liable for damages, to be sued for and recovered by action on the case, or other equivalent remedy, with costs of suit, in any court of the United States; such damages in all cases to be rated and assessed at such sum not less than one hundred dollars for the first, and fifty dollars for every subsequent performance, as to the court having cognizance thereof shall appear to be just;" and it is this: that the act of 1831 having given a right of action between the time of filing the title of the book in the clerk's office and the time of publication, the above clause in the supplemental act also gives the right of action.

It seems to me that a little reflection will convince us that that must necessarily be so, and must have been the intention of this supplemental act. It is plain that the reason why the act was passed, was because the prior law did not give sufficient protection to the author of a play. The principal profits derived from plays are their representations on the boards of a theatre. Now, it is apparent if that representation could be made, at any time, without the consent of the author of the work, he would be injured pecuniarily in the profits to be derived from his work, because it is from that source, principally, that the profits are expected to come. The injury, it is apparent, would be just as great, and in most instances it may be presumed, greater, by the representation of his play before its publication than it would after. Take the case of the composition of a dramatic work and notice given, as the law requires, by leaving the title page with the clerk, and after that is done, the obtaining by clandestine or surreptitious means, of a copy of that play, and publicly representing it upon the stage of a theatre. That, of course, would be an injury, pecuniarily, to the author. The question, then, is, whether this law did not intend to protect the author against such use without his consent. I think that it did. I think when it says that any manager, actor or other person who shall represent the composition without the consent of the author shall be liable for damages, to be sued for and recovered by an action on the case, it means as well a representation made before as after publication.

[Undoubtedly the act of 1831 contemplated a publication after the filing and deposit of a printed copy of the title-page of the work in the clerk's office, but it did not specify how soon that publication should be made; and, as in this case, there is evidence of the representation of "The Octoroon" and "Colleen Bawn," in various parts of the country for some time past, yet, as there is also evidence showing that for many representations made, compensation was given to the plaintiff, I am not prepared to say that, under the circumstances of this case, he has lost the right of action merely in consequence of the non-publication by him of these plays. It is conceded that there would be a complete and perfect remedy in a court of equity, and I do not know why there should not be in a court of law. Action on the case means an action brought in a court of law. It is under the words "other equivalent remedy," that the party would have recourse to a court of equity. So that as to the main question of law there is in the case, I think that the action can be maintained. But of course there are other questions that must be decided in favor of the plaintiff before he can recover in this case, independent of these questions of law. As you will have seen, gentlemen of the jury, from what the court has already said, before a party is entitled to the benefits of these acts, you must be satisfied that he has brought himself within

these provisions. A fundamental principle is, that he must be a citizen or a resident of the United States. The first question for you to determine is, whether this plaintiff is within this provision of the law. He was not born in the United States, and has never been naturalized. The only question is, is he a resident, or rather, was he a resident of the United States at the time that he filed in the office of the clerk of the court of the southern district of New York, the titles of the various plays which are in controversy here, namely: "Pauvrette," "The Octoroon," and "Colleen Bawn?" The title of the first was filed on the 2d of September 1858, the second the 12th of December 1859, and the third on the 23d of March 1860. The question is, whether at the time these acts were done by the plaintiff, he was a resident within the meaning of these acts of congress. That is a mixed question of law and of fact.][4] No person is entitled to the benefit of these acts unless he be at the time of filing the title, a citizen of the United States, or a resident therein. Residence ordinarily means domicil, or the continuance of a man in a place, having his home there. It is not necessary that he should be the occupant of his own house; he may be a boarder or a lodger in the house of another. The main question is, the intention with which he is staying in a particular place. In order to constitute residence, it is necessary that a man should go to a place, and take up his abode there with the intention of remaining, making it his home. If he does that, then he is a resident of that place. This question of residence is not to be determined by the length of time that the person may remain in a particular place. [The question, you will see, that is to be determined, is the state of mind, accompanied with acts, of the man at the time that he goes to the place and takes up his abode there.][4] For example, a man may go into a place and take up his abode there with the intention of remaining, and if so, he becomes a resident there, although he may afterwards change his mind, and within a short time remove. So if a person goes to a place with the intention of remaining for a limited time, although in point of fact he may remain for a year or more, still this does not constitute him a resident [of the town or of the place, because he does not go there and take up his abode with the intention or the purpose which existed in the other case, so that it is not to be determined by the length of time, but by the intention existing in the mind of the person, coupled with acts, which acts and intent are to indicate whether or not he is a resident of the place].[4] So it is his intention accompanied with his acts, and not the lapse of time, which determines the question of residence. [Applying these rules to the case before you, it is for you to determine whether, under the evidence this plaintiff has brought himself within the case which I have supposed as necessary in order to constitute a man a resident of a particular place.][5] The plaintiff came to this country in 1853, and remained, pursuing his profession as an actor and author until 1861. [He went to New York and took up his abode in New York City, and remained there some years. The question for you to determine is, whether, when he was here pursuing his profession, traveling about the country, from 1853 and so on up until the time that he took up what we may call his residence (without meaning by that such a residence as is spoken of in the act of congress) in New York, he came here and continued here and in New York, with the intention of remaining and taking up his abode as one of the people of this country. When he took a house in New York City, as it is claimed there is some evidence to show that he did, did he occupy that house with the intention of remaining in the country? * * * But you must believe from the evidence that the intention existed at the time, and that he did not at that time intend to return to England, but that his intention then was to remain here, and that this idea of returning to England afterwards arose in his mind; although there is no evidence, really, that I know of, of his actual status in England, only that he has been there since 1860 or 1861, managing a theatre. We only know that by the defendant, and perhaps from another party. We do not know what his intention is, further than may be inferred from these acts. So that, gentlemen, it is for you to determine, under the facts of the case, whether, within this description of the term residence, Mr. Boucicault was, at the time these titles were filed in the clerk's office in the southern district of New York, a resident of this country. If he was, then I think he was entitled to the protection of these laws.][5] If at the time of filing the title he had his abode in this country with the intention of remaining permanently, he was a resident within the meaning of the law, even though he afterwards changed his mind and returned to England. If, however, he was a sojourner, a transient person, or at the time of this filing had the intention to return to England, he is not entitled to the protection of these laws. [If he was a resident of the United States, then, being entitled to the protection of the law, his rights are to be determined by the law. In relation to the play of "Pauvrette," or what has been called by some of the witnesses, "The Avalanche, or Under the Snow," there does not seem to be any serious controversy. A copy of that play was deposited in the clerk's office on the 6th day of October, 1858. So that as to that, if

---

[4] [From 7 Am. Law Reg. (N. S.) 539.]

[5] [From 7 Am. Law Reg. (N. S.) 539.]

he were a resident, Mr. Boucicault complied in all respects with the law. It is not claimed but that he did, so far as obtaining a copyright, as I understand. That has been published, by which we mean it has been printed, under the authority of Mr. Boucicault himself, and the only question would be, whether the conduct of Mr. Boucicault has been such, in relation to this play, as to deprive him of the protection of the act of 1856. As I have already said, he had the right under that act, and the sole right, to print and publish that play. He had also the sole right to act and perform it, or to cause it to be acted, performed, or represented on any stage or public place, and no person could do either one or the other without his consent. The only question, then, in relation to this, is, whether he was a resident, or has consented to the representation of this play of "Pauvrette," or "Avalanche, or Under the Snow," by the defendant. If you are satisfied that he has consented to it, then the defendant would not be liable for the performance of that play. In relation to this, as in relation to the other plays.][7] You must, of course, be satisfied that the plays performed were the identical plays of which Mr. Boucicault was the author, not necessarily identical word for word, but the principle is that another has not the right to use the work of Mr. Boucicault's brain in the construction of a play, without his consent, and the mere alteration of a portion of the language would not deprive Mr. Boucicault of his protection, provided there was a substantial use of the play.

[I think that there ought to be some affirmative evidence introduced on the part of the defendant, that Mr. Boucicault, by word or deed, has consented to the performance of this play by the defendant—"Pauvrette" I mean; because it is perfectly clear that the act of 1856 gave the right to the author not only to perform, but to publish it, and declared that no one should perform it without his consent. The mere fact that it was published did not give others the right to enact it or perform it in a theatre; it must be done with his consent or acquiescence, and there ought to be some evidence that it was so done by the defendant. As to the other plays, the "Colleen Bawn" and the "Octoroon," there is no evidence that these plays were ever published by the plaintiff in this country, and the only question for you to determine would be, so far as this country is concerned, whether the use of the manuscripts of these plays by the defendant, was with the consent or acquiescence of the plaintiff. There is evidence tending to show that these two plays were published, that is, printed, and that this publication was made in England. I do not think that would make any difference as to the right of the plaintiff, unless that publication was with the consent of the plaintiff.][8]

[He does not seek, in other words, to follow up the beginning of the protection which our law gave him, but resorts to publication in England, instead of publication in this country, where, if he were a resident, he would have the right and would be protected. So that the question for you to determine is, whether he did make the publication in England, and of that I think there should be some affirmative evidence to satisfy you that such is the fact. This substantially, with one other remark, disposes of the rights of the party under the law in relation to copyright. That law prescribes a particular penalty for the unauthorized performance of a play; in the first instance, not less than $100, and for every subsequent performance $50; leaving a certain discretion with the court upon that subject; "as to the court having cognizance thereof shall appear to be just." In other words, it does not necessarily follow that in all cases the precise penalty fixed to the violation of the law shall be given, but the court is to exercise a certain discretion in relation to the matter.

[There is another branch of the case under which it is claimed the plaintiff is entitled to protection, and that is under what is termed the common-law right, irrespective and independent entirely of the statute, and because there has been no publication of the "Octoroon" and "Colleen Bawn" by Mr. Boucicault, or under his authority. If that be so, then he is entitled to the property in his work, existing in manuscript, and nobody can use it without his consent, and if it is so used, every person so using it is liable to respond in damages to him for such use. You will understand that there is no question raised in this branch of the case in relation to "Pauvrette," because that was published with his consent; and, if he is not protected under the law, he is not protected at all, because, having published it himself, he has given it to the public, and the only shield he has is the law.][8]

The fact that the two unpublished plays, after having been entered here, were published in England, would make no difference, unless that publication was with the consent of the plaintiff. No one would have the right to import and use them. Such consent, however, would be an abandonment of his rights, under our laws, and place him simply in the position of an ordinary English dramatist, who had published his plays in his own country; but this consent must be affirmatively proved.

[It is admitted on the part of the plaintiff that if a play is performed upon a public theatre, and there is a representation of the same from the mere fact of hearing the play performed, that does not constitute a violation of the law. How far that may be true,

---

[7] [From 7 Am. Law Reg. (N. S.) 539.]

[8] [From 7 Am. Law Reg. (N. S.) 539.]

it is not necessary for me to decide, because the evidence seems to show that these plays were performed some times, at any rate, by means of manuscripts. It is, then, necessary that it should be shown to your satisfaction that these were used with the consent or acquiescence of the plaintiff. The question for you to determine on this branch of the case is, whether he has ever published these works, and if he has not, whether the defendant has used them, obtaining them surreptitiously or from any person without his consent. He would have a right to perform his own plays.][10]

There having been no publication in this country of these two plays by him or under his authority, he is entitled by the common law, independent of the statute, to the property in them existing in manuscript. He may authorize their performance by others, or dispose of his property in them. [The question for you to determine is, if he has not published these works, if he has so disposed of them or acquiesced in the performance of these works by the defendant. I admit, also, that, conceding that he has not published them, he may also act in relation to them, as to, perhaps, deprive himself of the right of calling upon a person to respond in damages for the representation; that is to say, if he has allowed these plays to be represented throughout the community for a long space of time, without license, and without objection, knowing the fact to be so, then I think he may be considered to have abandoned the use of them to the public. But it must be apparent that it has been done with his knowledge and without objection on his part. That is to say, the facts must exist to indicate that he consented or acquiesced in their performance. Otherwise he is not prevented from claiming his property in these plays. I mean, of course, h's property at common law, as has been explained to you.][10] By allowing them to be represented throughout the community for a long period of time without license or objection, he may be considered as having abandoned the use of them to the public, otherwise he has the right to call upon any person using them without his consent to respond in damages. [It simply then comes, if you believe that the defendant is responsible in damages for the representation of these plays, to the question as to the damages which the plaintiff has actually sustained by the use of the plays by the defendant. That is a question of proof to be determined by the evidence in the case, and in relation to which you are to form your own conclusions. These plays were performed, it appears "Colleen Bawn" and the "Octoroon," sixteen times—eight times each—by the defendant in his theatre. It is for you to say, putting the case upon the ground of common law right, if the plaintiff has been damaged,

and to what extent he has been damnified by these representations by the defendant of these plays. As I have already said, there is no question in this branch of the case in relation to "Pauvrette," because that was published and his rights then stand upon the statute.][11] This is his common law right. The published plays he has given to the public, and his only protection is the statute. As to the unpublished plays there is no prescribed limit to the damages,—which are to be determined by the jury from the evidence.

Verdict for plaintiff, $900.

NOTE [from original report]. For a full citation of authorities on question of author's rights under a copyright, see the able brief of S. C. Perkins, Esq., in case of Stowe v. Thomas [Case No. 13,514]. See, also, Keene v. Wheatley [Id. 7,644]; Daly v. Palmer [Id. 3,552]; and Keene v. Clarke, 5 Rob. [N. Y.] 38; Greene v. Bishop [Case No. 5,763]; Boucicault v. Fox [Id. 1,691]. As to copyright of musical works under the statute, see Jollie v. Jaques [Id. 7,437]. As to rights of reporters and their publishers, see Little v. Gould [Cases Nos. 8,394 and 8,395]. As to common law rights of authors. see Crowe v. Aiken [Id. 3,441], and numerous cases there cited. The New York court of appeals have recently discussed the common law rights of authors. holding substantially as in this opinion that an author has at common law the exclusive right to the first publication; that the assignment of an alien author's right is valid, and within the cognizance of a court of equity; that representation of a dramatic composition upon the stage is not such a dedication as will authorize others to print and publish it without the author's consent; but that the manuscript and the author's right therein are still within the protection of the law, the same as if they had never been communicated to the public in any form; and further holding that the state courts have jurisdiction of the common law rights of an author, and will protect an alien friend in the same manner as a citizen of the United States. Palmer v. DeWitt, 47 N. Y. 532.