## STADTMULLER v. MILLER, Alien Property Custodian, et al.

(Circuit Court of Appeals, Second Circuit. March 19, 1926.)

No. 242.

War ⬉12—One compelled to remain in Germany during war held not to have lost "residence" or "domicile" in United States, and entitled to sue to recover property from Alien Property Custodian; "transient;" "resident" (*Trading with the Enemy Act* Oct. 6, 1917, §§ 2, 9 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½aa, 3115½e]).

One technically a German subject, who after residing in United States for 26 years and filing of application for citizenship, because of ill health and to settle his parents' estate, went to Germany in 1917 and was compelled against his will to remain until cessation of hostilities, and who during such time did no hostile act, *held* a "transient" during his stay in Germany, and not a "resident" of Germany, and did not lose his "residence within" United States, and hence was entitled, under Trading with the Enemy Act Oct. 6, 1917, §§ 2, 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½aa, 3115½e), to sue to recover property seized during his absence by Alien Property Custodian; "residence" being many times synonymous with "domicile," but not with "citizenship," and a "transient" being one who is temporarily within the jurisdiction by reason of business or pleasure.

[Ed. Note.—For other definitions, see Words Phrases, First and Second Series, Domicile; Residence; Resident; Transient.]

Appeal from the District Court of the United States for the Southern District of New York.

Action by Norbert Stadtmuller against Thomas W. Miller, as Alien Property Custodian, and another. From a decree dismissing the complaint, plaintiff appeals. Decree reversed.

Schnitzler, Thorn & Dayton, of New York City (Paul C. Schnitzler, of New York City, of counsel), for appellant.

Emory R. Buckner, U. S. Atty., of New York City, Ira Lloyd Letts, Asst. Atty. Gen., and Dean Hill Stanley, Sp. Asst. Atty. Gen., for appellees.

Hoke Smith, of Atlanta, Ga., and A. W. Lafferty, of New York City, amici curiæ, in behalf of John H. Volkmann.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This suit is brought under section 9 of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e) to recover property alleged to belong to the plaintiff, and which was seized by the Alien Property Custodian, and is now in the custody of the Treasurer of the United States. The District Court dismissed the complaint.

The plaintiff was born in Germany, and still is technically a German citizen. He came to the United States in 1890, and has ever since that time been, with the exception of an absence in Europe hereinafter referred to, a resident in the city of New York. He is a physician, and has been practicing his profession in New York ever since 1890, subject to the exception to be mentioned. His standing is evidenced by the fact that from February 1, 1910, until 1920, he continuously was a professor of clinical medicine at Columbia University. While he never became a citizen of the United States, he had filed application to become a citizen.

In 1917 he was in poor physical condition and suffering from serious eye trouble, which necessitated his temporary discontinuance of his medical practice. Acting upon the urgent advice of his doctors, he left the United States for Europe, with the intention of returning to this country "as soon as possible." He left in May, 1917, and carried with him the safe conduct issued to him by the State Department. He landed in Denmark, and then went to Germany "for a short rest," and "in order to settle the estate of his parents," intending thereupon to go to Switzerland, and then return to New York. He

found himself prohibited from leaving Germany, and while compelled so to remain did no act inimical to the interests of the United States. While compelled to remain against his will in Germany, his property in the United States, amounting to some $40,000, was seized as being that of an alien enemy, and his claim to have it restored to him by the government has been refused, and he brings this suit to recover it. Can he maintain the action? The District Court has decided that he cannot.

The complaint alleges, among other things, as follows:

"First. That the above-named plaintiff, ever since 1890 has been and now is a resident and a practicing physician in New York City, and never since 1890 has been a resident elsewhere, and that from February 1, 1910, until 1920, he continuously was a professor of clinical medicine at Columbia University, city of New York.

"Second. That plaintiff was born in Germany, and is still technically a German citizen, though he filed application to become a citizen of the United States; that at no time during the war plaintiff was an enemy, within the meaning of the Trading with the Enemy Act.

"Third. That in May, 1917, plaintiff, with the safe conduct issued him by the State Department, left this country for Europe in accordance with the urgent advice given to him by his doctors, he being at that time in very poor physical condition, and suffering from serious eye trouble, necessitating the temporary discontinuance of his practice; it being plaintiff's intention to return to the United States as soon as possible.

"Fourth. When landing in Denmark, plaintiff went to Germany for a short rest and in order to settle the estate of his parents, who had died within 24 hours of each other, and thereupon to go to Switzerland until he could return to New York, but that, on account of the regulations then existing, plaintiff was prohibited from leaving Germany, compelling his stay therein until the end of the war, when he returned to New York City as soon as possible.

"Fifth. That at no time during the war plaintiff was directly or indirectly employed by or in the service of the German government, or of any of the states composing it, and that at no time did he do anything or act hostile or inimical to the interests of the United States.

"Sixth. That plaintiff, when leaving for Europe in May, 1917, left in New York City his office, furniture, books, and equipment as a doctor, in charge of his associate, Dr. St. George, and also all his savings, amounting to about forty thousand ($40,000) dollars, in charge of Henry Ruhlender, and took only with him the small amount, which, under the regulations then prevailing, he was allowed to take along."

The complaint goes on to allege that, pursuant to the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.) the plaintiff's said moneys were seized by the Alien Property Custodian; that on December 6, 1922, the plaintiff filed a notice of claim, pursuant to section 9 of the Act of October 6, 1917, and also made application to the President of the United States; that the Alien Property Custodian filed an opinion recommending the allowance of the plaintiff's application, but that upon the adverse report of the Department of Justice the President denied his application.

The complaint prays in conclusion that the defendants be directed, in accordance with the said Trading with the Enemy Act and the treaty between this country and Prussia of 1828 (8 Stat. U. S. 378), to account to plaintiff for the moneys seized and held by them, and to pay the same over to plaintiff, with interest thereon.

The question is whether this complaint states a good cause of action. It is our opinion that it does, and we will proceed to state our reasons for the conclusion we have reached.

Section 9 of the Trading with the Enemy Act authorizes a suit to be brought by "any person, not an enemy, or ally of an enemy, claiming any interest, right, or title in any money or other property" taken over by the Alien Property Custodian and held by him or the Treasurer of the United States; and it is expressly provided that, if application for the return of the property is made to the President and he denies the application, "no such order by the President shall bar any person from the prosecution of any suit at law or in equity against the claimant to establish any right, title or interest which he may have in such money or other property."

The Trading with the Enemy Act no doubt was founded upon the public policy which forbids "the doing of acts that may be to the advantage of the enemy state by increasing its capacity for prolonging hostilities, in adding to the credit, money or goods, or other resources valuable to individuals in the enemy state." We concede that the intention was to make it impossible to aid the enemy (Germany) by forbidding that money

or property of any kind held in the United States should reach the hands of the enemy. The intention was to make it impossible for a dollar to inure to the advantage of Germany.

Unless the plaintiff is an "enemy," or an "ally of an enemy," within the meaning of the act, he is authorized by section 9 to maintain this suit. Section 2 of the act defines "enemy" as follows:

"That the word 'enemy,' as used herein, shall be deemed to mean, for the purposes of such trading and of this Act—'Any individual, partnership, or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war, or resident outside the United States and doing business within such territory, and any corporation incorporated within such territory of any nation with which the United States is at war or incorporated within any country other than the United States and doing business within such territory.'" Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½aa.

The plaintiff contends that the words "resident within," as used in section 2, mean domiciled within. The defendant contends that they mean "physical presence within." The word "resident" is somewhat ambiguous. This is due to the fact that it is used sometimes to mean domicile and sometimes temporary residence. The Standard Dictionary defines the word as "one having either legal residence or domicile."

As the word "residence," when used in a statute, may mean permanent domicile or temporary residence, in determining which meaning is to be attached to it in the Trading with the Enemy Act, the court must keep in view the legislative purpose as well as the context. In United States v. Curran, 299 F. 206, 211, this court pointed out that the word "residence," as used in various statutes, had been considered synonymous with domicile, and said: "The courts have so construed statutes relating to the qualification of voters, to homesteads, to taxation, to limitations, to succession, to guardianship, to actions for divorce and separation. * * * But this depends upon the intent of a particular statute as ascertained by construction of its provisions."

Residence and citizenship are not synonymous terms. Wolfe v. Hartford Life & Annuity Insurance Co., 13 S. Ct. 602, 148 U. S. 389, 37 L. Ed. 493; Pennsylvania Co. v. Bender, 13 S. Ct. 591, 148 U. S. 255, 37 L. Ed. 441; Sharon v. Hill (C. C.) 26 F. 337; Dan-ahy v. National Bank of Denison, 64 F. 148, 12 C. C. A. 75; Tug River Coal & Salt Co. v. Brigel, 67 F. 625, 14 C. C. A. 577; Chambers v. Prince (C. C.) 75 F. 176; Marks v. Marks (C. C.) 75 F. 521; Eisele v. Oddie (C. C.) 128 F. 941, 945; Yocum v. Parker, 130 F. 770, 66 C. C. A. 80; Irving v. Smith (C. C.) 132 F. 207; Sanbo v. Union Pacific Coal Co., 140 F. 713, 72 C. C. A. 24; Koike v. Atchison, T. & S. F. Ry. Co. (C. C.) 157 F. 623; Harding v. Standard Oil Co. (C. C.) 182 F. 421, 425; Hammerstein v. Lyne (D. C.) 200 F. 165; Delaware, L. & W. R. Co. v. Petrowsky, 250 F. 554, 162 C. C. A. 570. And in the consideration of the question herein involved we do not consider the fact that the plaintiff is not a citizen of the United States decisive of the merits of the case.

Residence and domicile are many times synonymous. St. Louis, etc., Ry. Co. v. McKnight, 89 S. W. 755, 99 Tex. 289; State ex rel. Kelly v. Shepherd, 117 S. W. 1169, 218 Mo. 656, 131 Am. St. Rep. 568; Buchholz v. Buchholz, 115 P. 88, 63 Wash. 213, Ann. Cas. 1912D, 395; Goldsworthy v. Aldrich, 14 R. I. 171, 175; State v. Wimby, 43 So. 984, 119 La. 139, 12 L. R. A. (N. S.) 98, 121 Am. St. Rep. 507, 12 Ann. Cas. 643; Harrison v. Harrison, 84 A. 57, 117 Md. 607; Beeman v. Kitzman, 99 N. W. 171, 124 Iowa, 86; King v. King, 71 A. 687, 74 N. J. Eq. 524, 135 Am. St. Rep. 731; Hannon v. Grizzard, 89 N. C. 115; Kellogg v. Winnebago County Supervisors, 42 Wis. 97, 107; In re Moir's Estate, 69 N. E. 905, 207 Ill. 180, 99 Am. St. Rep. 205.

In 26 Am. & Eng. Ency. of Law, 602, the rule is stated as follows: "The intention of the Legislature and the object aimed at, being the fundamental inquiry in judicial construction, are to control the literal interpretation of particular language in a statute, and language capable of more than one meaning is to be taken in that sense which will harmonize with such intention and object, and effect the purpose of the enactment."

In Margate Pier Co. v. Hannam, 3 Barn. & Ald. 266, 270, Abbott, C. J., quotes from Lord Coke the following: "Acts of Parliament are to be so construed as no man that is innocent or free from injury or wrong be, by a literal construction, punished or endamaged."

In Holy Trinity Church v. United States, 12 S. Ct. 511, 143 U. S. 457, 36 L. Ed. 226, Mr. Justice Brewer, writing for the court, again quotes approvingly Lord Coke's statement.

In United States v. Kirby, 7 Wall. 482, 486, 19 L. Ed. 278, Mr. Justice Field, writing for the court, said: "All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the Legislature intended exceptions to its language, which would avoid results of this character. The reason of the' law in such cases should prevail over its letter."

To hold that Stadtmuller, detained in Germany against his will and loyal to the United States throughout the war, was nevertheless an enemy, whose property might be taken from him, is such an unreasonable and oppressive construction, and so repugnant to common sense, common justice, and common honesty, that we shall not so decide, unless compelled to do so.

That the complainant's domicile was in the United States at the time he left for his visit to Europe for a temporary purpose, and with the intention of returning to this country, will not be denied. He had resided here for more than 26 years, and had filed his application to become a citizen here, and had no intention of removing from this country to any other, and in fact returned to the United States as soon as he was permitted to leave Germany. In Kent's Commentaries, vol. 1, p. 76, the rule is laid down as follows: "If the intention to establish a permanent residence be ascertained, the recency of the establishment, though it may have been for a day only, is immaterial. If there be no such intention and the residence be involuntary or constrained, then a residence, however long, does not change the original character of the party, or give him a new and hostile one."

In Boucicault v. Wood, 3 Fed. Cas. 988, No. 1,693, 2 Biss. 34, Judge Drummond stated the law as follows: "No person is entitled to the benefit of these acts unless he be, at the time of filing the title, a citizen of the United States, or a resident therein. Residence ordinarily means domicile, or the continuance of a man in a place, having his home there. * * * The main question is the intention with which he is staying in a particular place. * * * So if a person goes to a place with the intention of remaining for a limited time, although in point of fact he may remain for a year or more, still this does not constitute him a resident. * * * So it is his intention accompanied with his acts, and not the lapse of time, which determines the question of residence."

In Miller v. Sinjen, 289 F. 388, the Circuit Court of Appeals for the Eighth Circuit, affirming (D. C.) 281 F. 889, sustained the right of a naturalized citizen of the United States, who went to Germany in 1909 and continued to reside there until the Armistice, to recover back the property which, during his absence in Germany, the Alien Property Custodian had seized. In 1914, after the war broke out, he applied to the American consul at Kiel for a passport, but this was refused, on the ground that he could not overcome the presumption of expatriation. During his absence from the United States his property was seized by the Alien Property Custodian. After his return to the United States he brought an action, under section 9, to recover possession of the property. In that case the man and his wife had been detained in Germany by the sickness of her mother and her death in 1909. They were subsequently detained in an attempt to sell the property in Germany, which he owned, and were unable to sell. As the man had been born in Germany, and then had been naturalized in this country, the contention was that under the Act of March 2, 1907, 34 Stat. 1228, § 2 (Comp. St. § 3959), he was presumed to have ceased to be an American citizen, and Germany was to be deemed to be his place of residence. But the courts held that the circumstances under which he had resided in Germany, together with his testimony that he had at all times regarded himself as an American citizen, and that he at all times intended to return to the United States as his permanent domicile, he had not lost his American citizenship, and was not an alien enemy, notwithstanding his residence in Germany. While there he had not engaged in business, but had bought some German bonds, "as he explains, because of the popular furore."

It seems to have been assumed, both in the District Court and in the Circuit Court of Appeals, that if, during the period of his sojourn in Germany, which, as we have said, was during the entire period of the war, he did no act hostile to the United States, and intended to return to this country at the close of the war, he had a clear and unquestioned right to the return of his property under section 9.

If Miller v. Sinjen was correctly decided, there can be no question but that the instant case was decided erroneously. Upon the facts alleged in the complaint herein, the plaintiff, Stadtmuller, was a domiciled resident of New York; that he was in Germany for a temporary purpose and all the time in-

tended returning to New York, but was not permitted to do so by government regulations. · He did no act of disloyalty to the United States throughout the entire period, and returned to this country as soon as possible after the end of the war.

In Wheaton's International Law (5th Eng. Ed.) p. 449, it is said: "The question, whether the person to be affected by the right of domicile has sufficiently made known his intention of fixing himself permanently in the foreign country, must depend upon all the circumstances of the case. If he has made no express declaration on the subject, and his secret intention is to be discovered, his acts must be attended to as affording the most satisfactory evidence of his intention. On this ground the courts of England have decided, that a person who removes to a foreign country, settles himself there, and engages in the trade of the country, furnishes by these acts such evidences of an intention permanently to reside there, as to stamp him with the national character of the State where he resides. In questions on this subject, the chief point to be considered is the animus manendi; and courts are to devise such reasonable rules of evidence as may establish the fact of intention."

In Hall's International Law (8th Ed.) § 168, it is said: "The chief test of the existence of such an identification of a neutral subject with any enemy state as will suffice to clothe him with an enemy character is supplied by the fact of domicile. For belligerent purposes a person may be said to be domiciled in a country when he lives there under circumstances which give rise to a reasonable presumption that he intends to make it his sole or principal place of residence during an unlimited time." And in a note to the section it is said: "The Anglo-American test of enemy character is based on domicile, using that word, as Westlake says, in a peculiar sense known as a 'trade domicile' in war."

In Taylor's International Public Law, § 517, it is said: "Upon the outbreak of war the status of every resident of a hostile state is seriously affected by the event. In war as in peace the national character of a person is for many purposes determined by his domicile, that is, by his actual residence as qualified by his intention of there remaining. * · * * Enemy character attaches to all persons domiciled in the enemy's country, although they may be neutrals in fact, or even loyal citizens of the country to which they belong. * * * As Lord Stowell expressed it: 'The character that is gained by residence ceases by nonresidence. It is an adventitious character, and no longer adheres to him from the moment that he puts himself in motion bona fide to quit the country sine animo revertendi.'"

In Professor Hyde's recent work on International Law (volume 2, § 789, p. 557), it is said: "It has been commonly said that, according to the view prevailing in the United States and England, the neutral or enemy character of goods is to be determined by the so-called domicile of the owner, rather than by his nationality. Disagreement as to what the term domicile signifies, when made the criterion of enemy character, and as to the circumstances when it should be applied as such, has rendered obscure the actual tests relied upon by the courts."

And in section 790 he says: "According to American theory, it may be said that, while the domicile rather than the nationality of a merchant determines generally the enemy or neutral character of his trade, his domicile, as synonymous with his legal home, yields as a test of such character to his residence in and commercial connection with the territory of a belligerent state, and may even yield to his commercial establishment therein in spite of actual residence elsewhere, with respect at least to property belonging to that establishment."

. He then goes on to say: "Some states of Continental Europe, in opposition to the views prevailing in the United States and England, regard the nationality of the trader rather than the place of his commercial domicile as the true test of the neutral or unneutral character of his property. Wide divergence of views as to the correct test precluded agreement at the International Naval Conference at London, of 1908–1909."

In the judgment of the Lords of Appeal in Prize Causes, cited in Wheaton's International Law (5th Eng. Ed.) 443, upon the cases arising out of the capture from the Dutch of the island of St. Eustatius by Admiral Rodney in 1785, by Lord Camden, he stated that, "if a man went into a foreign country upon a visit, to travel for health, to settle a particular business, or the like, he thought it would be hard to seize upon his goods; but a residence, not attended with these circumstances, ought to be considered as a permanent residence."

Under the decision of Sir William Scott in The Indian Chief, 3 Rob. 12, 17, if an American citizen resident in England, and carrying on business there, at the breaking out of war starts to return to the United States, he loses his English character and

resumes his American character from the moment he puts himself in motion bona fide to quit the country sine animo revertendi. In the majority opinion, written by Mr. Justice Washington for the Supreme Court in The Venus, 8 Cranch, 253, 280 (3 L. Ed. 553) the above doctrine was approved. He said: "Having once acquired a national character by residence in a foreign country, he ought to be bound by all the consequences of it, until he has thrown it off, either by an actual return to his native country, or to that where he was naturalized, or by commencing his removal, bona fide, and without an intention of returning."

In The Venus, supra, decided in 1814, the Supreme Court held that, if a citizen of the United States established his domicile in a foreign country between which and the United States war afterwards broke out, any property shipped by him before knowledge of the war, and captured by an American ship after the declaration of war, must be condemned as lawful prize. It appears that in that case the domicile of the claimants and not their citizenship was the test of enemy character. The majority of the court concluded that from the prolonged residence and business in England of the individuals concerned a domicile in that country had been established.

Chief Justice Marshall dissented in a long opinion. He began it by saying: "I entirely concur in so much of the opinion delivered in this case, as attaches a hostile character to the property of an American citizen continuing, after the declaration of war, to reside and trade in the country of the enemy, and I subscribe implicitly to the reasoning urged in its support. But from so much of that opinion as subjects to confiscation the property of a citizen shipped before a knowledge of the war, and which disallows the defence founded on an intention to change his domicile and to return to the United States, manifested in a sufficient manner, and within a reasonable time after knowledge of the war, although it be subsequent to the capture, I feel myself compelled to dissent." Yet during the time he was in Great Britain during the war he was deemed an "enemy" of the United States, and his property in that country was subject to seizure.

And in the same case (page 301) Chief Justice Marshall said: "I cannot, for instance, admit that an American citizen, who had gained a domicile in England during peace, and was desirous of returning home on the breaking out of war, *but was detained by force,* could, under the authority of this

11 F.(2d)—47

opinion [Sir William Scott's opinion in The Indian Chief], be treated as a British trader, with respect to his property embarked before a knowledge of the war."

In 1813, Mr. Justice Story, sitting as a Circuit Justice in Rhode Island, decided The Francis, 9 Fed. Cas. 673, No. 5,034, 1 Gall. 614. The ship Francis was captured during the war by an American privateer and libeled as enemy's property. Among the claims to portions of the cargo was one interposed by Colin Gillespie, who was born in Scotland, but had been naturalized in this country in 1798. He formed a mercantile partnership with a man in New York, and it was agreed that, in the interest of the partnership business, Gillespie should reside in Great Britain. Gillespie accordingly went to Scotland, and resided there until the spring of 1813. In an affidavit he filed in the case he stated that it was always his intention to hold to his adopted (American) allegiance, and to do no act inconsistent with his allegiance to the United States. As soon as he could arrange his affairs after he learned of the war, he left Great Britain for the United States, and at the time of the suit he was residing in New York with his family. Although Gillespie was an American citizen, he was domiciled as a merchant in the enemy country, and was carrying on trade in that country at the breaking out of war, and was therefore deemed an enemy, and his property was subject to confiscation.

In the course of his opinion Justice Story said: " * * * if a party, who has resided in an enemy country, puts himself in itinere to return to his native country, with an intention of bona fide residence there, he is deemed already to have resumed his native character, although he has not actually arrived in such country. * * * But, until he has actually so put himsef in itinere the character of the country, where he resides, attaches indissolubly to him. He takes it with all its benefits and all its disadvantages." The above case was affirmed by the Supreme Court (8 Cranch, 363, 3 L. Ed. 590), and the principle was laid down that the commercial domicile of a merchant at the time of the capture of his goods determines the character of those goods, whether hostile or neutral.

But Stadtmuller had not established a commercial domicile in Germany. His domicile was in the United States when war broke out, and was not abandoned by him. He was in Germany for a temporary purpose, and was prevented from leaving the country by military regulations, and was as much re-

strained from doing so as though he were confined in prison. Can such a man be said to have become a resident of Germany? We think not.

In The Peterhoff, 5 Wall. 28, 60, 18 L. Ed. 564, Chief Justice Chase, after referring to the fact that persons residing in the rebel states at any time during the Civil War must be considered as enemies during such residence, irrespective of their personal sentiments, went on to say: "But this has never held in respect to persons faithful to the Union, who have escaped from those States, and have subsequently resided in the loyal States, or in neutral countries. *Such citizens of the United States lost no rights as citizens by reason of temporary and constrained residence* in the rebellious portion of the country."

We fail to see that it should make any difference whether the person whose residence was so *constrained* was a citizen or a domiciled and friendly alien. It is enough that his residence was constrained, his sentiments loyal, and that he did no hostile act.

In Frost v. Brisbin, 19 Wend. (N. Y.) 11, 14 (32 Am. Dec. 423) Chief Justice Nelson of New York (afterwards Mr. Justice Nelson of the Supreme Court of the United States), construing a statute of New York, and after a review of the authorities, said: "The cases cited above, establish that the transient visit of a person for a time at a place does not make him a resident while there; that something more is necessary to entitle him to that character. There must be a settled, fixed abode, an intention to remain permanently at least for a time, for business or other purposes, to constitute a residence within the legal meaning of that term. * * * One of these cases expressly, and all of them virtually, decide that actual residence, without regard to the domicile of the defendant, was within the contemplation of the statutes."

In Barney v. Oelrichs, 11 S. Ct. 414, 138 U. S. 529, 34 L. Ed. 1037, the court, construing a New York statute of limitations, said: "* * * We are of opinion that 'to reside out of the state' comprehended something more than alighting at a place in travel or in pursuit of temporary objects, and such we understand to be the result of decision by the courts of New York."

In this connection attention may be called to the construction which the courts have put upon the naturalization laws of the United States. Those laws make it necessary that an alien applying for naturalization should have *resided continuously* within the United States for five years at least immediately preceding the date of his application. This court held, in United States v. Curran, 299 F. 206, that the words "resided continuously" did not mean that the alien should be present continuously in this country for that period "for mere physical absence, with the animus revertendi, does not discontinue residence in a place." See United States v. Dick (D. C.) 291 F. 420; United States v. Jorgenson (D. C.) 241 F. 412, 414; In re Cook (D. C.) 239 F. 782, 783; In re Reichenburg (D. C.) 238 F. 859; In re Timourian (D. C.) 225 F. 570; In re Schneider (C. C.) 164 F. 335.

In United States v. Cantini, 212 F. 925, 129 C. C. A. 445, the Circuit Court of Appeals in the Third Circuit, construing the Naturalization Act (34 Stat. 596), expressed the opinion that the phrase "resided continuously" would be unreasonably restricted, if it were to be held to be fatally interrupted "by the briefest visit of pleasure, or friendship, or business, beyond the boundaries of the United States." And the court went on to say: "For example, let us suppose that Cantini's absence in Italy had been due to the fact that he had been immediately arrested in that country on a groundless charge, and had been detained in prison for the period in question. Having left the United States with the intention of returning in a short time, and having been prevented by force from carrying his intention into effect, the continuous character of his residence would probably not be disturbed." And the court further said: "* * * And the rules of construction admonish us that we are not to suppose that Congress intends any statute to produce an unreasonable result, unless the language used be such as to leave no fair doubt that such a result was the object of the law."

For like reasons we are satisfied that it would be most unreasonable to hold that Stadtmuller lost his "residence" or his "domicile" in the United States when he left the country for a brief visit to Europe for the purpose of recovering his health in 1917, and in entering Germany to see about the settlement of his parents' estate. And if he did not lose his American residence by that temporary entry into the country, he no more lost it when he was compelled against his will to remain there by the military regulations, which did not permit him to withdraw while war continued.

In general, the civil rights of a person depend upon whether that person is a transient, a resident, an inhabitant with a domicile, or a subject, or a citizen. See Meares,

Trading with the Enemy Act, p. 79. A transient is one who is temporarily within the jurisdiction by reason of business or pleasure. In our opinion, upon the allegations of this complaint, Stadtmuller entered Germany as a transient for a temporary purpose, and not with any view of becoming a resident, or establishing a domicile there, or engaging in business. It was a place of mere temporary sojourn, while he saw about the settlement of the estates of his deceased parents. A mere transient is not a resident. 24 Am. & Eng. Encyc. of Law, 698. The fact that, while there, he was prevented by military regulations from leaving the country, did not change his status from that of a "transient" to that of a "resident."

In Vowinckel v. First Fed. Trust Co. et al., 10 F.(2d) 19, decided by the Circuit Court of Appeals in the Ninth Circuit on January 4, 1926, a question analogous to that in this case was involved. Vowinckel was a German by birth, who came to California in 1892, declared his intention in 1898 to become a citizen of the United States, returned to Germany September 22, 1915, entered the Red Cross as a surgeon in Germany, October 12, 1915, and remained there until March, 1919, when he came back to this country. During his absence from the United States his property in this country was seized by the Alien Property Custodian. After his return he brought suit under section 9 in the District Court for the Northern District of California. That court decided the matter adversely dismissing his bill. On appeal to the Circuit Court of Appeals the case was reversed, and the right to maintain the suit was sustained.

In a number of opinions of the Attorney General, construing claims made for the return of property belonging to persons domiciled in the United States, but who were in Germany during the war and were prevented from returning, and whose property in the United States had been seized by the Alien Property Custodian, the claims have been sustained. The Attorney General has pointed out, correctly, as we think, the distinction between a transient, resident, inhabitant with domicile, and a citizen or subject, and the word "reside" has been interpreted as being something more than arriving at a place in travel or in pursuit of temporary objects. He has held that mere presence is not tantamount to residence under the statute, nor mere absence equivalent to residence elsewhere. He correctly reached the conclusion that the term "resident" or "residence" imports a fixed abode for the time being, as

contradistinguished from a place of temporary sojourn, and that a mere transient is not a resident. See Opinions of Attorney General of April 27, 1922, claim of Oscar von Passavant; of May 18, 1921, claim of Otto Weber; of October 19, 1922, claim of Hans Goldschmidt; of October 21, 1921, claim of Paul Haberland; of June 17, 1921, claim of Hans Hohner; of December 2, 1920, Jung claims.

A merchant of Manila, Philippine Islands, was in Germany during the entire duration of the war, and his property in this country was seized by the Alien Property Custodian. On his return to the United States he made claim for the restoration of his property under section 9 of the act. The matter was referred to the Attorney General, who reported that he was entitled to the return of the property. His opinion is dated May 18, 1922, in the matter of claim No. 5869. After referring to certain authorities the opinion said: "In those cases the distinction between a transient, resident, inhabitant with domicile, and a citizen or subject was discussed, and the word 'reside' was interpreted as being something more than arriving at a place in travel or in pursuit of temporary objects. Further, it was held that mere presence was not tantamount to residence under the statute nor mere absence equivalent to residence elsewhere. In short, it may be said that the conclusion to be reached from all of the above set out authorities is to the effect that the term 'resident' or 'residence' imports a fixed abode for the time being, as contradistinguished from a place of temporary sojourn, and that a mere transient is not a resident. You are therefore referred to the opinion in the Passavant claim for this department's interpretation of the word 'resident' as used in the Trading with the Enemy Act."

We may state our conclusion to be that the appellant, Stadtmuller, is entitled to maintain the action under section 9 of the Trading with the Enemy Act. While in Germany during the war he entered the country for a temporary purpose, was a transient, and never a resident, as he was compelled against his will, and contrary to all of his intentions, to remain in the country during the period hostilities continued. He was at no time disloyal to the United States, and as soon as he was permitted to do so he returned to his residence in New York, which he had at no time abandoned or lost. To hold that under the circumstances alleged in his complaint Stadtmuller is not entitled to maintain this suit is to impute to Congress

an intention which the act does not, in our opinion, warrant, and which is so repugnant to our ideas of justice and equity that we cannot believe that Congress ever intended such a result.

Decree reversed.