UNITED STATES et al. v. IRVING TRUST CO. et al.

District Court, S. D. New York.

April 19, 1943.

Mathias F. Correa, U. S. Atty., of New York City (George A. McNulty, Chief, Alien Property Unit, War Division, Department of Justice, of Washington, D. C., Albert E. Arent, Sp. Asst. to the Atty. Gen., William L. Lynch and Laurence H. Axman, Asst. U. S. Attys., both of New York City, and William Lawrence, II, of Boston, Mass., Atty., Alien Property Unit, of counsel), for plaintiffs.

Selden Bacon, of New York City (Nathan L. Miller and Selden Bacon, both of New York City, of counsel), for defendant Irving Trust Co.

GALSTON, District Judge.

This action is brought pursuant to § 24 (1) of the Judicial Code, 28 U.S.C.A. § 41 (1), and § 17 of the Trading With The Enemy Act, October 6, 1917, C. 106, 40 Stat. 425, 50 U.S.C.A.Appendix, § 17. The complaint is in the nature of a bill of review and seeks to vacate a decree in the action entitled John S. Sorenson and Thorleif S. B. Nielsen, as the surviving partners of the firm of Crossman & Sielcken, against Howard Sutherland, as Alien Property Custodian, Frank White, as Treasurer of the United States, and Zentral Einkaufs Gesellschaft, m. b. H., entered December 30, 1929, in the United States District Court for the Southern District of New York; and to recover from the defendants the sum of $726,681.40, with interest thereon, from April 10, 1930, which sum was paid to the plaintiffs in that suit pursuant to said decree.

It is charged that on December 21, 1927, the defendants in this suit, with intent to deceive and defraud the United States and this court, caused the complaint to be filed in the earlier suit without disclosing that the real parties in interest were the estate of one Hermann Sielcken, deceased, and the firm of Theodor Wille of Hamburg, Germany, both enemies within the meaning of the Trading With The Enemy Act, 50 U.S. C.A.Appendix, § 1 et seq. It is alleged herein that during March and April of 1928, the defendant Avery and representatives of Zentral Einkaufsgesellschaft (hereinafter referred to as "Z. E. G.") held conferences in Germany, knowing that the funds seized by the Alien Property Cus-

todian as the property of Z. E. G. were not subject to lawful return to the real parties in interest under the Trading With The Enemy Act, and that in such conferences the said Avery discussed with officials of the German Government the possibility of securing a default judgment to the end that proceeds of the suit could be equally divided between the Estate of Sielcken, deceased, and the defendant, Z. E. G. It is alleged that Z. E. G. failed to appear and that a default was entered against it; but that Avery failed to convince officers in the Department of Justice that such a default judgment would be binding upon the officers of the United States. Thereafter, on August 9, 1929, Z. E. G. appeared and filed an answer. It is now charged that subsequent to the filing of the answer of the defendant Z. E. G., and in furtherance of a conspiracy to obtain a judgment therein for the plaintiffs, Avery, as attorney for Sorenson and Nielsen, the plaintiffs, and for the said Irving Trust Company and other attorneys associated with Avery in that capacity, and one Heinrich F. Albert, a German attorney, representing the German Government as successor to Z. E. G., and Carl von Lewinsky, agent for the German Government before the Mixed Claims Commission, and Arthur Garfield Hays as attorney for the said Z. E. G. and the German Government and for the firm of Theodor Wille & Co., and one William Abramson, a partner of Hays, conferred concerning the evidence to be offered or withheld at the trial of said case "for the purpose of obtaining a judgment in favor of the plaintiffs"; it is further alleged herein that the main defenses asserted by the defendant Z. E. G. were abandoned and that material facts were withheld from the evidence at the trial with the intent that the trial result in the entry of a decree in favor of the plaintiffs.

The defendant Sorenson answered by denying participation in any scheme or conspiracy and asked the court to protect his interests; the defendant Avery has not been served and has not appeared. The Irving Trust Company appeared individually and as executor of the Estate of Hermann Sielcken, deceased, and its answer, besides making material denials, sets up first a partial defense of estoppel, alleging that the plaintiffs herein are privies of the Alien Property Custodian and the Treasurer named in the former suit, and are estopped and barred by the decree of December 30, 1929, which was entered with full jurisdiction of the court, from disputing the decree or any of the matters thereby adjudged, including not only matters that were actually pleaded, "but also all matters that might have been pleaded in answer to the claim asserted in and by the original bill therein, whether pleaded or not".

Another separate partial defense is that in 1934 the United States assessed on the firm of Crossman & Sielcken in liquidation an income tax, and so much of the entire recovery under the aforesaid decree of December 30, 1929, as constituted income, which sum, amounting to $22,092.65, the Irving Trust Company, as executor of the Sielcken Estate, paid to the Treasurer of the United States on July 12, 1934.

As a further separate defense it is alleged that in 1917 and 1918, the Alien Property Custodian was fully advised of all the terms of the articles of co-partnership of the firm of Crossman & Sielcken, of the provisions of the will of Hermann Sielcken of March 23, 1914, of its admission to probate, and of the issue of letters testamentary to the Irving Trust Company in January, 1918; also that in 1919 and 1920 the Alien Property Custodian was fully advised of the claim of Clara Sielcken, the widow of Hermann Sielcken, that she was not an enemy and that Hermann Sielcken was not an enemy and never had been an enemy, but was a citizen of the United States and retained his domicile in New York City until his death. The defense also asserts that the Alien Property Custodian, together with the then Attorney General of the United States, investigated those claims and in March, 1921, decided that Sielcken had been a citizen of the United States and retained his domicile in the City of New York until his death, and had never been an enemy and that Clara Sielcken was a citizen of the United States and had had her domicile in the City of New York and was not and had never been an enemy. Moreover, it is alleged that the Alien Property Custodian and the Attorney General of the United States had been fully advised of the nature and extent of the interest of the Estate of Hermann Sielcken in the assets and property of the firm of Crossman & Sielcken; and for more than a year prior to the trial of said suit had been advised by the attorneys for the plaintiff of all the defenses which said Z. E. G. had caused to be asserted in Germany's answer to the Memorial before the Mixed

Claims Commission on the same claim, together with all the evidence filed in support of that answer by Germany. It is also alleged that the American Agent before the Mixed Claims Commission, Bonynge, and his counsel Martin, and the Alien Property Custodian, and the Treasurer of the United States, and their counsel in the former suit, were at all times informed in advance of trial of all proposals for settlement of the litigation and of all stipulations and agreements made or entered in that suit with regard to the facts or production of proof. It is alleged that despite the full information of all facts that had occurred, no notice of claim was given prior to January 6, 1938, to the Irving Trust Company, either individually or as executor of any impropriety on the part of anyone in any of the transactions before trial or in the conduct of the suit, or in the payments made on sums recovered under the decree. It is further alleged that the defendant, as executor, prior to January 1, 1938, and in good faith, and without notice of any such claim of fraud in procuring such decree, and in reliance upon the decree, had disbursed for expenses of administration of the Estate of Sielcken, and by distribution to his residuary legatee, the whole amount received by the defendant as executor, and prior to February 1, 1941, had incurred obligations for additional lawful and unpaid expenses of such administration all in excess of the total value of all property of the Estate still held by it.

In addition it is alleged that in the Surrogate's Court of the County of New York, in the accounting proceeding of the Irving Trust Company as executor of the Sielcken Estate, the Attorney General of the United States, as successor to the Alien Property Custodian, had intervened in 1938, and admitted that the claims made by him were subordinate to any lawful expenditures of the administration of the estate, and consented to the orders of that court directing payments of over $59,000 out of funds then remaining in the hands of the Chase National Bank as security for certain refunding bonds given by the residuary legatee to the Irving Trust Company as executor for such expenses of administration, and had consented to the approval of items of disbursement and distribution shown in the account of the Irving Trust Company as executor, as of December 31, 1937.

To revert to the allegations of the complaint, it is there alleged that the collusive scheme and conspiracy charged in the complaint were not discovered, and could not, by the exercise of reasonable diligence, have been discovered by the United States or its officers until on or about January 6, 1938, and that on May 19, 1938, the United States by its officers, moved, in the United States District Court for the Southern District of New York, to vacate the original decree of December 30, 1929; that on January 30, 1939, the said motion was granted and an order vacating the decree was entered and filed on April 28, 1939. Sorenson v. Sutherland, D.C., 27 F.Supp. 44. The complaint further recites that the Irving Trust Company, as executor of Sielcken, deceased, on May 13, 1939, filed a notice of appeal from the aforesaid order, and the United States Circuit Court of Appeals for the Second Circuit, on February 19, 1940, reversed the order, 109 F.2d 714, and on January 6, 1941, the Supreme Court of the United States affirmed the judgment of the Circuit Court of Appeals. Jackson v. Irving Trust Co., 311 U.S. 494, 61 S.Ct. 326, 85 L.Ed. 297.

In the answer of the Irving Trust Company it is alleged that it was not in its individual capacity a party to the proceeding instituted by motion in 1938 by the Attorney General as successor to the Alien Property Custodian, and that no claim was ever asserted against the Irving Trust Company individually by the plaintiffs or any of them on account of any matters alleged in the complaint, until the commencement of the present action on May 9, 1941, and that the defendant individually received no part of any sums or property paid pursuant to the decree of December 30, 1929; that it had no part whatever individually in the procurement of said decree and had no part therein as such executor, save as its answer expressly alleges.

A consideration of the proceedings in connection with the motion of May 19, 1938, will be helpful to the decision of this case. When the motion was made to vacate the judgment, the Irving Trust Company, as executor of Hermann Sielcken, deceased, intervened. It appeared that no appeal had been taken from the decree of December 30, 1929. The application to vacate was made on the ground that the court had lacked jurisdiction to entertain the suit because Hermann Sielcken, a member of

Crossman & Sielcken, had resided in Germany since 1914 and had thus become an enemy alien after war was declared. The appeal before the Circuit Court of Appeals from the order granting the motion to vacate the decree, is reported in Sorenson et al. v. Sutherland et al., 2 Cir., 109 F.2d 714, 717. Judge Augustus N. Hand, for the court, wrote:

"In our opinion the various issues involved in the motion to vacate the decree were before Judge Caffey and his decision was binding on the later court. Chicot County Drainage District v. Baxter State Bank, [308 U.S. 371], 60 S.Ct. 317, 84 L.Ed. [329], decided by the Supreme Court on January 2, 1940; Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104."

The opinion notes that the complaint before Judge Caffey alleged that Sorenson, Nielsen and Sielcken were citizens and residents of the United States, doing business under the name of Crossman & Sielcken up to the date of the death of Sielcken; that that firm had at all times been a resident of New York, had not been a resident within the territory of any nation with which the United States was at war, and was not at any time an enemy or ally of an enemy. It is further observed by Judge Hand that:

"Z. E. G. not only denied these allegations but also set up the separate defense that Sielcken resided in Germany when war was declared and that he became an enemy alien, that the firm of Crossman & Sielcken was dissolved by the declaration of war, and that the claim asserted by the plaintiffs as surviving partners belonged to the estate of Sielcken and not to the plaintiffs as surviving partners. The government, likewise, attacked the bill both by way of demurrer and by answer and raised the same issues."

The court thus noting the issues raised by the pleadings concluded that the adjudication by Judge Caffey "necessarily involved findings that Sielcken resided in New York at the time of his death, that he was not an enemy alien within the meaning of the 'Trading with the Enemy Act' and that the claim against Z. E. G. belonged to the plaintiffs as surviving and liquidating partners."

After consideration of § 9 (a) of the Trading With The Enemy Act, 50 U.S.C.A. Appendix, § 9(a),[1] the opinion states that by the decree of December 30, 1929, "It was necessarily held that the plaintiffs had filed their claim as required by the Trading with the Enemy Act and that Z. E. G. was an enemy alien and owed moneys to the partnership to the amount of $716,160.37 adjudged to be due."

It was held that Judge Caffey had been obliged to resolve disputed questions of fact on which the jurisdiction of the court depended, and that the jurisdictional facts thus established could not be attacked collaterally. Judge Hand said:

"The government had the same opportunity to present the issue as to residence and citizenship of Sielcken in the trial before Judge Caffey as in the later proceeding and can gain no right to a second presentation.

"The case at bar falls clearly within the rule of Stoll v. Gottlieb and of the Chicot

---

[1] "§ 9. (a) That any person not an enemy or ally of enemy claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States, or to whom any debt may be owing from an enemy or ally of enemy whose property or any part thereof shall have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States may file with the said custodian a notice of his claim under oath and in such form and containing such particulars as the said custodian shall require; * * * if the claimant shall have filed the notice as above required and shall have made no

application to the President, said claimant may institute a suit in equity in the Supreme Court of the District of Columbia or in the district court of the United States for the district in which such claimant resides, or, if a corporation, where it has its principal place of business (to which suit the Alien Property Custodian or the Treasurer of the United States, as the case may be, shall be made a party defendant), to establish the interest, right, title, or debt so claimed, and if so established the court shall order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States or the interest therein to which the court shall determine said claimant is entitled. * * *"

County decision. Not only was there every opportunity to present the matters now relied on by the government in the trial before Judge Caffey, but those matters were expressly raised and argued before him. * * * But it was urged that the plaintiffs had no right to sue under the Trading with the Enemy Act—which is the very issue of jurisdiction which is now before this court. Apart from the failure to use the word 'jurisdiction' the parties to the previous trial could scarcely have raised the issue of right to sue more squarely."

Moreover, the opinion recites: "The answer of Z. E. G. alleged that title to the claim was held by the Custodian and that the German firm of Wille & Company had a half interest in the claim. In oral argument before Judge Caffey, dismissal of the action was asked by counsel for the government on the ground that Sielcken was an enemy under the Act."

It was pointed out that if Judge Caffey was wrong in deciding the issues before him which were pertinent to the jurisdictional question, the Government should have taken an appeal; but that the merits of the questions presented could not be raised on a motion to vacate. "Once lost, the right to appeal cannot be regained in this circuitous manner." So that although it was urged on the motion that Sorenson and Nielsen had been made plaintiffs for the purpose of creating a case cognizable under the Trading With The Enemy Act, the Circuit Court of Appeals held that "The objections to their claim because their partner Sielcken was an enemy alien and was the sole owner of the capital of the partnership and their firm was engaged in a joint enterprise with Wille & Company, an alleged enemy alien concern, were all overruled by Judge Caffey. There can be no basis for impeaching his decree in a new litigation on the very grounds urged at the original trial (United States v. Throckmorton, 98 U.S. 61, 66, 25 L.Ed. 93), even though those grounds were jurisdictional. Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104."

The court also considered the attempt made in the moving affidavits to show that the judgment was collusive because a prior agreement had been made with Z. E. G. by the German executor of Sielcken to indemnify it against any recoveries by Sorenson and Nielsen as surviving partners of Crossman & Sielcken. The court said:

"In other words, there seems to be a contention by the government * * * that the plaintiffs obtained judgment against the funds of Z. E. G. in the hands of the Custodian, knowing that a substantial part of their recovery was to be turned back to Z. E. G. and that in April, 1930, they repaid to Z. E. G. a substantial percentage of the recovery pursuant to this understanding."

The court observed that at the time of the settlement there were substantial assets of the Sielcken Estate in Germany, out of which the agreement of indemnity, if held valid by German courts, might have been satisfied. Said the court: "Therefore, the mere payment to Z. E. G. from the American assets would not show that the judgment recovery against them by the plaintiffs was fraudulent in whole or in part."

Finally it was observed: "Moreover, if a decree is to be set aside, on the ground of fraud, nine years after it was rendered, the remedy would have to be by bill of review, which would only be allowed if the court was satisfied that the evidence was not available at the time the original suit was litigated and that it was presented without undue delay after discovery. United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93; Central Trust Co. v. Grant Locomotive Works, 135 U.S. 207, 10 S.Ct. 736, 34 L.Ed. 97; Toledo Scale Co. v. Computing Scale Co., 261 U.S. 399, 421, 43 S.Ct. 458, 67 L.Ed. 719."

█ In consequence the critical questions to be determined in this case are what evidence adduced at this trial "was not available at the time the original suit was litigated," whether such evidence, if any, "was presented without undue delay after discovery" and finally, of course, whether such evidence, if any, together with all the other evidence in the case entitled the plaintiffs to the relief sought.

In a memorandum filed during this trial prompted by a request of the court, plaintiffs assert that the principal significant facts not known to the Government at the time of the trial before Judge Caffey were the following:

1. The existence of a collusive scheme to avoid statutory limitations by bringing the suit in the names of Sorenson and Nielsen, so as to create a semblance of jurisdiction which did not exist, since the real owner of the claim, the Irving Trust Company as executor of the Estate of Hermann Sielcken, had no better status than the tes-

tator who was an enemy within the meaning of the Trading With The Enemy Act.

2. The general releases executed by Sorenson and Nielsen in 1917 of their interest in the firm of Crossman & Sielcken.

3. The exhibits to the German answer to the Wille Memorial before the Mixed Claims Commission which show that Hermann Sielcken had lost American citizenship by expatriation.

4. The 1922 Memorial of the Columbia Trust Company (the then executor of the Sielcken Estate), Sorenson and Nielsen against Germany, in which the executor admitted ownership of half of the claim against Z. E. G. and acknowledged that the firm of Theodor Wille owned the other half interest.

5. The negotiations for settlement with Z. E. G. in Germany and in the United States, the agreements and understandings reached, and the fact that the representatives of Z. E. G. were not interested in defeating the law suit.

The memorandum recites that the above information was not obtained before the year 1937 at the earliest, except that in early June, 1930, about two months after the Government's appeal time had expired, the Government received information disclosing that the proceeds of the judgment had been shared with Z. E. G. and the firm of Theodor Wille.

Important as disclosing what knowledge was in possession of the Alien Property Custodian and his counsel, the Attorney General of the United States, prior to the trial of the former suit, is the letter to Thomas E. Rhodes, Special Assistant to the Attorney General, dated December 7, 1928, written by R. S. Doyle, one of the attorneys representing the plaintiffs. Apparently the letter was written at the suggestion of Rhodes following a conference he held with attorneys for the plaintiff on November 28, 1929. Doyle sought a stipulation concerning documents which were part of the Z. E. G. record on file with the Mixed Claims Commission in which, said Doyle, "substantially a similar issue is presented." Attached to the Doyle letter was a copy of the Z. E. G. Memorial, including its exhibits. Doyle wrote:

"In the answer of Germany, it questions whether Mr. Sielcken was in fact a resident of the United States temporarily residing in Germany, or whether Mrs. Sielcken was such, and as to the effect of his New York will to Columbia Knickerbocker Trust Company as executor. These matters of dispute relate only to the allegations of paragraphs (1) to (4) of our Memorial, and as to these matters stipulation is not sought."

The letter directed Rhodes' attention to "a certain arbitration and interlocutory decision on which a compromise was concluded, which Germany claims is binding upon us and which compromise they claim was by implication ratified by Messrs. Sorenson and Nielsen".

Doyle added:

"Negotiations for a settlement of this matter were instituted at the suggestion of certain officials of the German Foreign Office. Mr. Avery went to Berlin and it was suggested that the opinion of the Minister of Justice be taken on this subject.

"Instead," (Doyle continues) "the opinion of a distinguished judge of the court was obtained, who held

" 'That the alleged compromise relied on in the answer of Germany was void, owing to the personal interest of two of the executors in the subject matter of the arbitration.' "

Doyle stated: "Other reasons are also afforded for voiding the compromise."

A mere reading of Germany's answer to the Z. E. G. Memorial would have apprised Rhodes that the right of Sorenson and Nielsen to file the claims was acutely contested, for:

1. Germany requested to be informed concerning the activities of Sorenson and Nielsen as liquidators and whether they were still entitled "to collect and receive all of the assets and credits of said firm of Crossman & Sielcken and to procure and recover upon any and all causes of action and claims of whatever nature, existing in favor of such firm at the time of its dissolution."

2. The German answer asserted that Nielsen on February 4, 1928, had written the firm of Theodor Wille: "I have had nothing to do with the liquidation since estate settled with me in June nineteen hundred twentyone."

3. The answer further stated that the record fails to show that either the Columbia Trust Company or Sorenson or Nielsen is entitled to make the claim.

4. The German answer directs attention to the provisions of the partnership agree-

ment and asserts that after the partnership had been dissolved by the death of Hermann Sielcken, the entire capital became a part of the Hermann Sielcken Estate.

5. The answer directs attention to the interest of Theodor Wille in the Z. E. G. transactions.

Doyle also called attention to the default of Z. E. G. in the pending suit.

It is quite clear then, and the point cannot be too strongly emphasized, that the burden of defense at that time rested solely on the Alien Property Custodian and the Treasurer of the United States, for the remaining defendant, Z. E. G., was in default and had been in default since December 21, 1927, when the suit was started. It is idle to explain that the assistant to whom the defense of the suit had been delegated was too busy to avail himself of the information which was placed before him. The very failure of Z. E. G. to enter an appearance and to file an answer placed the laboring oar in the hands of the Attorney General. The office of the Attorney General for a long period before the trial knew of the residence of Sielcken in Germany and of his status as an enemy alien at the time of his death in October, 1917. The Attorney General's office knew also of the controversy between Z. E. G. and Crossman & Sielcken in Germany, of the arbitration in that country and of the compromise which resulted. Indeed, Rhodes also knew of Germany's claim that by implication Sorenson and Nielsen ratified that compromise.

Rhodes had informed Doyle that a default judgment taken against Z. E. G. would have no validity whatsoever so far as the Alien Property Custodian or the United States Treasurer was concerned. Subsequently, from the answer of Z. E. G. he learned—though the information had been available to him before—that at the outbreak of the war between the United States and Germany, Sielcken resided in Germany and became an enemy alien. He learned from the answer that it was alleged by Z. E. G. that in October, 1917, pursuant to the Trading With The Enemy Act, the firm of Crossman & Sielcken was declared an enemy firm and that all of its assets were turned over to or seized by the Enemy Alien Property Custodian; that title to said assets was held by the Enemy Alien Property Custodian as trustee, and that the Alien Property Custodian never released said as-

sets to the firm of Crossman & Sielcken, or to the plaintiffs' surviving partners of said firm, and that "the plaintiffs have not title to the alleged cause of action." Moreover, he was informed by the Z. E. G. answer that Sielcken died in Germany in October, 1917, leaving a will dated February 18, 1917; that it was alleged that the will had been duly probated in Germany, and certain executors, Carl Eisenberg, Richard Eisenberg, one Georgias, and Diederichsen took charge of his assets in Germany. It was also asserted by Z. E. G. that by reason of the facts alleged in the complaint, any claim arising thereunder was a claim in Germany during the war, and that the plaintiffs had no interest therein. Moreover, there was attached to the answer and made part thereof, the contract of arbitration between the executors and Z. E. G. involving the question whether the risk of loss on the cargo rested upon the plaintiffs or the defendant Z. E. G. Then the allegation is made that the Board of Arbitration decided that the risk of loss was on the firm of Crossman & Sielcken, except as to two shipments on which the Board requested further information; and thereafter, in July 1928, the parties to the arbitration settled all questions concerning the matter; that the plaintiffs did not repudiate it. It is also alleged that Sielcken owned all of the assets of Crossman & Sielcken and that the Estate of Sielcken succeeded to all assets thereof, and that the plaintiffs were estopped from making the claim set forth in the complaint. As an additional defense it is alleged that Crossman & Sielcken had a joint account with the firm of Theodor Wille & Company, of Hamburg, Germany, in connection with the shipments involved in the suit, "according to the terms of which Theodor Wille & Company would have an equal interest in said shipments with the firm of Crossman & Sielcken", and that Theodor Wille & Co. were a necessary party to the action.

At the earlier trial the partnership agreement was offered in evidence by the plaintiffs and this passage was read to the court: "Upon the death of the party of the first part (i. e. Sielcken), it shall be the duty of the surviving partners to transfer and pay over to the executor of the will of the deceased partner, his capital as above defined, and also all the property and business of the firm."

Not only then was the status of the Sielcken Estate in respect to the owner-

ship of capital assets clearly before the court, but so too was the stipulation that the firm of Theodor Wille & Company,—an enemy firm—had an interest in any proceeds of the recovery; (See stipulation, Exhibit 9-D, paragraph 18) and Rhodes argued during the trial:

"If this partnership continued the conduct of the business by the American partner, residing in the United States, it would be in part for the benefit of the home partner Sielcken, whom this evidence here shows was domiciled in Germany.

"He had his estate over there; he lived there. His office was there and his business was there. That was his home and domicile. That would be in clear violation of the Act for the American partner to continue to carry on the business for him; so it must obviously follow that the partnership was dissolved upon the declaring of war, because nowhere in the Act is there based upon citizenship any standard, but it is based on domicile."

At this trial Rhodes testified: "I never paid any attention to what they were trying to settle."

He took the position all along that the only real defendants in the case were the Alien Property Custodian and the Treasurer of the United States, and that any agreement of settlement would have no affect whatsoever on the United States. Rhodes admitted that he was in no way prevented from interposing any defense that he thought should be interposed or from interposing any evidence which he thought pertinent. He admitted that he discussed the Z. E. G. Memorial with the German agents and that he knew of the existence of the Wille Memorial. He admitted that the best defense that he could think of to the Sorenson and Nielsen case was that the shipments were at the risk of Crossman & Sielcken until delivered at the point of destination, and that the stipulation entered into at the trial and one or more of the exhibits, showed that Sielcken had gone to Germany in 1913 or 1914 and remained there until his death. Sorenson had so testified at the trial. Rhodes said that he had argued to the court as vigorously as he could that the proof established domicile of Sielcken in Germany within the meaning of Stadtmuller v. Miller, 2 Cir., 11 F.2d 732, 45 A.L.R. 895, and Vowinckel v. First Federal Trust Co., 9 Cir., 10 F.2d 19; and that accordingly

Sielcken was an enemy alien within the meaning of the Trading With The Enemy Act. Rhodes testified he was not interested in the Wille claim before the Mixed Claims Commission.

The plaintiffs here make the contention that the Attorney General was not constructively charged with the data disclosed in the files of the Mixed Claims Commission. Electric Boat Co. v. United States, 55 Ct.Cl. 497. Passing that, for the point need not be determined here, the situation is, of course, quite different in respect to data the Alien Property Custodian possessed, for the Attorney General was certainly charged with actual or constructive knowledge thereof. They are both charged with knowledge of the notice of claim filed October 29, 1927, by the American Exchange Irving Trust Company, and by Sorenson and Nielsen as liquidators of the firm of Crossman & Sielcken, and with knowledge of the notice of claim filed by Sorenson and Nielsen on November 12, 1927, as the surviving partners of the firm of Crossman & Sielcken. In the second notice of claim, the Irving Trust Company did not join. Was it not obligatory upon the Alien Property Custodian and the Attorney General to inquire why the Irving Trust Company was not a party either to the second claim or to the suit? The Office of the Alien Property Custodian had been informed before the trial that the two notices represented the same claim.

Rhodes admitted that Barnes had told him of discussions that Avery had had in Germany with the German officials concerning the Sielcken claims, and that the Germans claimed that the arbitration agreement which had been entered into barred Sorenson and Nielsen from recovering anything. Also, some time in the middle of 1928, he knew that if Sorenson and Nielsen recovered in the suit, the Germans could in turn recover under the indemnity agreement.

A memorandum written by Rhodes for the Solicitor General, dated March 24, 1930, discussing whether an appeal should be taken from the District Court's decree, contains many interesting passages. He observes that Arthur Garfield Hays, counsel for Z. E. G., "vigorously contested the case on behalf of said defendant. I represented the Alien Property Custodian and the Treasurer of the United States, and Mr. Hays and I cooperated fully and presented

every pertinent point we could discover on behalf of the defendants. * * *

"I have gone over this record very carefully and am convinced that the decision of the court is correct; * * *" Later: "The plaintiffs being citizens of the United States and non-enemies within the meaning of the Trading With The Enemy Act, and their debt having arisen prior to October 6, 1917, are clearly entitled to recover * * * out of the funds of the debtor held by the Custodian in the Treasury of the United States, pursuant to the provisions of Sec. 9(a) of the Trading With The Enemy Act."

Rhodes then refers to an accompanying letter of Hays, dated March 24, 1930, in which the latter states that Z. E. G. would not take an appeal. Rhodes concluded that as the enemy defendant has decided to take no appeal, "there is no reason for the Alien Property Custodian and the Treasurer to take an appeal."

The Office of the Alien Property Custodian, as far back as 1920, knew of the 1917 releases which had been executed by Sorenson and Nielsen to the firm of Crossman & Sielcken in liquidation. Those releases contained an undertaking on their parts that should any amount be awarded to them "individually, by any prize court or otherwise, on account of goods shipped during the year 1915 and seized by the British Navy Authorities, I will pay all such amounts forthwith to the Columbia Trust Company, as executors of the Estate of Hermann Sielcken, Deceased."

The Alien Property Custodian, by J. A. Bauer, Manager of the General Business Department, in a letter of January 14, 1918, to the Columbia Trust Company, makes specific reference to the settlement of the releases given by Sorenson and Nielsen. It is therein stated: "The settlement made with the surviving partners, whose interest terminated upon the dissolution of the firm, is approved."

Certainly in preparation for the trial before Judge Caffey, the Alien Property Custodian and his counsel, the Attorney General, were chargeable with knowledge of that letter. Thus, had the Attorney General been of opinion that the executor of Hermann Sielcken, Deceased, was a necessary party to the litigation, he was in possession of all the necessary facts to move before the trial or to set up a defense with respect thereto.

Moreover, the Alien Property Custodian indeed was a party to the first accounting of the executor.

Rhodes apparently relied on Mayer v. Garvan, D.C., 270 F. 229, and Sutherland v. Mayer, 271 U.S. 272, 46 S.Ct. 538, 70 L.Ed. 943, in the belief that Sielcken's enemy alien status in 1917 could not affect the right of the plaintiffs to recover. The plaintiffs herein now contend that those authorities do not apply to a debt as distinguished from property of the plaintiffs which was seized by the Enemy Alien Property Custodian. It is wholly immaterial to the decision of the issue in this case whether that distinction is or is not sound. Rhodes had actual or constructive knowledge of the facts. If the Attorney General was wrong in his law then, his error would be no ground for retrial of the issue now.

From the foregoing it would seem that no important item set forth in plaintiffs' supplemental memorandum of significant facts not known to the Government was in fact not known to the Government at the time of the trial before Judge Caffey. The Government even had knowledge of the fact that an attempt had been made by Z. E. G. and the firm of Crossman & Sielcken to settle their controversy. Rhodes was aware before the trial that Avery had gone to Germany to discuss the plaintiffs' claims. But Rhodes testified: "* * * I was not interested in any settlement between the German Government and Mr. Barnes."

Fraud certainly cannot be presumed from the settlement which followed shortly after the entry of decree in the former suit. Nor does it compel an inference that there was a hard and fast pretrial agreement between the plaintiffs and Z. E. G. Indeed if there was any moral obliquity imputable to the plaintiffs or their counsel Avery, such moral obliquity certainly cannot touch the Irving Trust Company, individually or even as executor. The plaintiffs here argue that the real party in interest in the former litigation was the Irving Trust Company, as executor of the Sielcken Estate. Actually, the ultimate and principal party in interest was Clara Sielcken-Schwartz, who was the sole residuary legatee under the Sielcken will. Avery, while ostensibly acting as counsel for Sorenson and Nielsen with the consent of the Irving Trust Company as executor of the Sielcken Estate, was actually in the case

representing Clara Sielcken-Schwartz, and had at her instance and as her representative initiated the whole matter and controlled it in her behalf from the filing of the notice of claim to the institution of the suit and thereafter through settlement. It is true that Sorenson and Nielsen had at best a remote, indirect and contingent interest in the outcome of the litigation, and it may be added that Avery deliberately sought plaintiffs whose status would be unequivocal under the Trading With The Enemy Act. But the Irving Trust Company was guilty of no fraud in permitting the main beneficiary to pursue her remedy in such manner as she was counseled by her attorney. In the end, Sorenson and Nielsen, by virtue of their release agreements with the firm of Crossman & Sielcken, were obligated to pay over to the Irving Trust Company, as executor of the Estate of Hermann Sielcken, any proceeds resulting from the prosecution of their claims. At that stage the Irving Trust Company became a mere stakeholder. On the other hand, if Sorenson and Nielsen had been unsuccessful, no obligation would have attached to the Irving Trust Company.

By and large the Irving Trust Company is free from any fraud intrinsic to the former litigation or extrinsic thereto. This bill of review must therefore be dismissed. United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93, Toledo Co. v. Computing Co., 261 U.S. 399, 43 S.Ct. 458, 67 L.Ed. 719, and Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104.

Laches and estoppel have been urged as defenses on the ground that the position of the Irving Trust Company has changed during the twelve years following the entry of the decree. The Government of the United States, on what was apparently a careful review of the record in the former trial, elected to take no appeal. It adds nothing to urge that such decision was reached because Z. E. G. had decided not to appeal; for Z. E. G. had been in default for over a year, and apparently it was the Government's insistence that led Z. E. G. to appear and file an answer and defend the case. The Government was convinced that Z. E. G. had put in a vigorous defense and thus apparently its doubt about judgment going by default had been removed. Not only, however, did the Government fail to take an appeal, but later on, in the belief that new evidence had been discovered

bearing on the fraud, a mischosen remedy was adopted to vacate by motion the original decree on the ground that it appeared that the District Court was without jurisdiction. And then finally, after that effort had proved abortive, this suit was brought. The plaintiffs contend that defenses of laches and estoppel cannot be urged against the United States. However that may be, the law of this case is laid down by our Circuit Court of Appeals in Sorenson v. Sutherland et al., 109 F.2d 714.

That instruction leaves nothing for this court to decide beyond finding as I do that all the evidence on which fraud is now predicated was available to the plaintiffs herein at the time the original suit was litigated, and that the failure to file this bill prior to May, 1941, constitutes an unreasonable delay which has prejudiced the position of the Irving Trust Company. The complaint will be dismissed. Concurrently with this opinion findings of fact and conclusions of law will be filed.